# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY W. PERL,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No.  1:16-cv-00196-SAB<br><br>ORDER GRANTING IN PART PLAINTIFF'S SOCIAL SECURITY APPEAL AND MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S MOTION TO REMAND, AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS<br><br>(ECF Nos. 12, 18, 19) |

## I.

## INTRODUCTION

Plaintiff Anthony Perl ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from ulcerative colitis and deep vein thrombosis ("DVT").  For the reasons set forth below, Plaintiff's Social Security appeal and motion for summary judgment shall be granted in part and Defendant's motion to remand shall be granted.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 5, 6.)

1

# II.

# FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for disability benefits dated December 17, 2012, alleging disability beginning on October 19, 2012. (AR 158-59.) Plaintiff's applications were initially denied on August 26, 2013, and denied upon reconsideration on October 16, 2013. (AR 93-97, 100-04.) Plaintiff requested and received a hearing before Administrative Law Judge G. Ross Wheatley ("the ALJ"). Plaintiff appeared for a hearing on January 27, 2015. (AR 26-61.) On February 5, 2015, the ALJ found that Plaintiff was not disabled. (AR 10-20.) The Appeals Council denied Plaintiff's request for review on December 9, 2015. (AR 1-5.)

### A.   Hearing Testimony

Plaintiff testified at the January 27, 2015 hearing and was represented by counsel. He was 60 years old at the time of the hearing. (AR 30.) He graduated from high school and attended junior college for a semester and San Jose State for a semester. (AR 30-31.) However, he did not get any college degrees. (AR 31.) He can read and write and do math up to algebra. (AR 32.) He worked primarily as a stationary engineer, which is operating and maintaining buildings. (AR 31.) He also worked as a real estate agent, which required him to take a test and obtain a license. (AR 31.) However, his real estate agent license is expired. (AR 32.)

He stated he last worked in October 2012, but he indicated that he may have worked through December 2012. (AR 32-33.) He has an open workers' compensation claim. (AR 33.) When the ALJ referenced allegations in Plaintiff's complaint of ulcerative colitis, deep vein thrombosis ("DVT") in the left leg, and a mention of something involving the right elbow, Plaintiff indicated that he was not familiar with the elbow issue. (AR 33.) However, after the ALJ indicated that there was a passing comment about possible tendonitis, Plaintiff stated that he gets tendonitis from the Prednisone that he has been taking. (AR 33.)

Plaintiff stated that the ulcerative colitis causes Plaintiff the most problems in his daily life. (AR 33-34.) At the time of the hearing, he had loose stools frequently throughout the day which caused him to need to go to the restroom approximately 4 to 6 times a day. (AR 34.) He feels that his need to go to the restroom is always urgent and he has trouble distinguishing

whether he has to pass gas, urinate, or do a bowel movement because the pressures all feel the same. (AR 34.)

He sees Dr. Kenneth Kelsen for his colitis. (AR 34.) At his last appointment with Dr. Kelsen on January 20, 2015, the only change to Plaintiff's treatment regimen was the addition of a cholesterol treatment. (AR 34.) Plaintiff takes Lialda tablets and he has adjusted his diet so that he does not eat anything that aggravates his condition, such as fruits and vegetables. (AR 35.) Changing his diet has somewhat alleviated the issues. (AR 35.) The medications mitigate the colitis symptoms to a degree, but they are never controlled. (AR 35-36.) Plaintiff feels that the colitis is never controlled because prior to the disease he had one bowel movement a day and he has never gotten to that point since. (AR 35.) Plaintiff testified that when he has to use the Prednisone, he gets all of the steroid symptoms, such as back acne and anger issues. (AR 50.)

Plaintiff's doctor wants Plaintiff to walk and get as much exercise as he can without fatiguing himself. (AR 36.) Plaintiff walks daily around the 25 acre property that he is living on and walks a mile or two in short periods. (AR 36.) He walks for approximately two to three hours before he is fatigued and needs to take a nap. (AR 45.) He can do about two hours of chores before he gets fatigued and has to sit down. (AR 50.) He can lift 45 to 50 lbs. (AR 45-46.) He installed a port-a-potty on his property near the outbuilding where he has a little hobby shop because he had an accident trying to make it from the outbuilding to the house. (AR 51.)

Plaintiff had an IVC filter put in the venous cava for his DVT, which Plaintiff indicated is so that the large clots will not make it to his lungs and it gives the doctors a chance to treat him. (AR 37.) Plaintiff's last episode of DVT was in 2008 or 2009 when the IVC filter surgery happened. (AR 38.) He also takes eight milligrams of "an INR of two-and-a-half to three." (AR 38.) Plaintiff's DVT is controlled. (AR 38-39.)

The only other condition he is being treated for is his lower back injury, which he has worker's compensation for. (AR 39.) He sees a chiropractor biweekly which seems to help. (AR 39.) He has never seen a neurosurgeon, had injections, or had a recommendation for surgery. (AR 39.)

He is able to take a shower and get dressed. (AR 39-40.) He lives with his mother and

1 his wife. (AR 40.) He can cook anything he wants to and he likes to make a German goulash.
2 (AR 40.) He uses the microwave just to warm things up. (AR 40.) He is able to make a
3 sandwich. (AR 40.) He can pick things up around the house and make the bed. (AR 40.) He
4 can put things in the dishwasher and he takes out the trash. (AR 41.) He does activities on the
5 property, such as spending a couple of hours trimming brush to maintain it from getting too wild.
6 (AR 41.) Plaintiff and his family are trying to put a garden in. (AR 41.)

7 He likes to read and mostly reads science fiction. (AR 41-42.) He has a home computer,
8 e-mail, Facebook, and a cell phone, which he texts on. (AR 42.) He usually watches TV after
9 dinner until bedtime for a couple of hours. (AR 42-43.) He has a driver's license and does drive.
10 (AR 43.) He drives to the downtown area, which is 15 minutes away from his house and he
11 knows where all the restrooms are in all the stores. (AR 43.) Plaintiff stayed at a hotel the night
12 before the hearing and drove the block from the hotel to the hearing. (AR 43.) It took Plaintiff a
13 little over an hour to drive to the town the hearing was in from his home and he made it without
14 stopping. (AR 43.) He socializes with family members and they spend the holidays together.
15 (AR 44.) His two daughters both live in the same town that he does, and he has three
16 grandchildren, who he sees as often as he can. (AR 44.) He helps watch his 6 month old
17 grandchild 4 days a week for an hour-and-a-half, but he hands her off to her father as soon as he
18 gets there. (AR 44.) He socializes with friends and went to dinner with friends three weeks
19 before the hearing. (AR 44-45.)

20 Plaintiff's most recent job as a chief engineer was in an office environment where IBM
21 was the anchor tenant. (AR 46.) There were two towers of eight stories each that were half a
22 million square feet. (AR 46.) He was responsible for operating the building, such as fire life
23 safety and ventilation, except for renting and customer relations with the tenants. (AR 46-47.)
24 His office was on the first floor of the garage and the bathroom that was available to him was on
25 the fifth floor, so he would have to walk 600 feet across the garage and take an elevator to the
26 fifth floor. (AR 46.) He did soil himself on quite a few occasions where he had to go home and
27 clean up. (AR 47.)

28 Plaintiff worked as a chief engineer at a frozen warehouse plant from 2002 through 2005.

4

1 (AR 47.)  He had one crew member who was responsible for maintaining all the forklifts and he
2 would also assist Plaintiff with maintaining the ammonia refrigeration system.  (AR 47.)  Since it
3 was an ammonia refrigeration system, his mental acuity had to be 100 perfect or he would put
4 himself and others in danger.  (AR 47.)

5       Plaintiff's work as a real estate agent included going door-to-door leaving leaflets,
6 knocking on doors, and trying to get business since he started with no clients.  (AR 48.)  After he
7 stopped working, he attempted to help his son-in-law do some repairs on his home and he
8 worked as hard as he would as if he went to work, but after 4 days, he was exhausted and was in
9 bed for a week.  (AR 48.)

10       Plaintiff's colitis is cyclical where symptoms get better and get worse, but they never
11 stop.  (AR 48-49.)  At the time of the hearing, he was in a good period, but he expected that in a
12 month he would be in a bad period with more symptoms.  (AR 48-49.)  During the flare-ups, the
13 bleeding increases, the stools get looser and looser, and he uses a Mesalamine enema which
14 alleviates some symptoms and with time reverses it.  (AR 49.)

15       He spends between 10 to 20 minutes in the restroom, and during a flare-up, he is in the
16 restroom probably 8 to 10 times a day.  (AR 49.)  He has to be careful with what he eats all the
17 time so that he does not aggravate his condition.  (AR 49.)  The medications are the only things
18 he does to alleviate the symptoms.  (AR 49-50.)  Plaintiff's concentration is affected by the
19 colitis, such as he forgets why he went across a room to get something or what he wanted to go
20 get.  (AR 50.)

21       Vocational Expert ("VE") David Dettmer also testified at the hearing.  The VE testified
22 that his testimony would be consistent with the DOT, and that he would say if it was not.  (AR
23 52.)  He reviewed the exhibits in the file and familiarized himself with Plaintiff's vocational
24 background.  (AR 52.)

25       Plaintiff's past work was as a building repairer, DOT code 899.381-010, medium, SVP 7;
26 construction worker, DOT code 869.664-014, heavy, SVP 4; and real estate agent, DOT code
27 186.117-058, light, SVP 8, but a SVP 5 or 6 as performed.  (AR 52-53.)

28       The hypotheticals that the ALJ asked the VE all involved an individual of Plaintiff's age,

1  education, and work experience. (AR 53.)  The first hypothetical was for an individual who is
2  capable of performing work at the medium level, which the ALJ defined as standing or walking
3  for about six hours and sitting for up to six hours with normal breaks. (AR 53.)  The individual
4  also requires ready access to a restroom. (AR 53.)  The VE testified that with ready access to a
5  restroom, that individual could not perform Plaintiff's past work. (AR 53.)  A real estate agent
6  has to be out and about and a construction worker and building repairer does not have ready
7  access. (AR 53-54.)  The ALJ asked the VE to give a timeframe for ready.  The VE said ready
8  was within two minutes. (AR 54.)  The ALJ then asked the VE to consider the first hypothetical
9  again, except five minutes was the definition for ready access to a restroom. (AR 54.)  The VE
10 testified that that individual could perform all past work. (AR 55.)

11     The second hypothetical that the ALJ gave the VE was for an individual who is capable
12 of performing work at the light level, which the ALJ defined as standing or walking for 6 hours
13 and sitting for 6 hours with normal breaks.  The individual also requires ready access to a
14 restroom, which is defined as accessible within five minutes. (AR 55.)  The VE testified that the
15 individual could perform past work as a real estate agent. (AR 55.)

16     The VE testified that if ready access was two minutes or less, then the individual would
17 be unable to perform any of Plaintiff's past work. (AR 55-56.)

18     The third hypothetical that the ALJ asked was based on the first and second
19 hypotheticals, but had an additional limitation that the individual would have three or more
20 unexcused or unscheduled absences per month. (AR 56.)  The VE testified that that individual
21 would generally not have work, but he indicated that it is hard for him to really say regarding
22 real estate because that is a self-paced job. (AR 56.)

23     The fourth hypothetical that the ALJ asked was based on the first and second
24 hypotheticals, but had an additional limitation that the individual would require additional breaks
25 every two hours for ten minutes in addition to regularly scheduled breaks. (AR 56-57.)  The
26 following exchange then occurred:

27          A     Generally not.  Again, real estate agent's one of those odd jobs
          which is self-paced - -
28          Q     Okay.

```
            A - - kind of work their own hours, can schedule appointments, etcetera,
    maybe even be able to work from home. So it's hard for me to say real estate.
    Some, some slots would be okay, some slots would not be.
            Q       Okay.
            A       Can't say it's work preclusive for a real estate agent.
```

(AR 57.)

Plaintiff's counsel asked the VE whether the individual in the third and fourth hypotheticals would be able to do real estate work on a full-time basis or a part-time basis. (AR 58.) The VE indicated that he could not really answer that question, but he does not know what is exactly full-time for a real estate agent. (AR 58.)

Plaintiff's counsel then asked a hypothetical for an individual who is limited to only doing what are considered low stress jobs. (AR 58.) The VE testified that he does not consider real estate agent high stress or low stress job, but the VE then indicated that it depends on the definition of what is low stress and what is a stressor. (AR 58.)

Plaintiff's counsel then asked another hypothetical for a person whose attention and concentration is impaired more than 25 percent of the time. (AR 58.) The VE testified that that individual could not perform the real estate agent position, because the person needs to be on top of their game if they are going to do it. (AR 58.)

When Plaintiff's counsel asked about an individual who needs to lie down or rest at unpredictable intervals for 30 minutes at a time, the VE testified that that would be very difficult for a real estate agent because an agent has appointments and has to be out and about and it is problematic if it's at unpredictable intervals. (AR 59.)

Plaintiff's counsel then asked the VE a hypothetical for an individual who has to take unscheduled breaks three to five times a day for 20 minutes at a time. (AR 59.) The VE testified that the individual would not be able to do the past relevant work on a full-time basis. (AR 59.)

**B.    ALJ Findings**

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff meets the insured status requirements through December 31, 2016;

- Plaintiff has not engaged in substantial gainful activity since October 19, 2012, the alleged onset date;

- Plaintiff has the following severe impairments: ulcerative colitis and DVT;
- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments;
- Plaintiff has the residual functional capacity ("RFC") to perform medium work, defined as standing and walking or sitting up to six hours during an eight hour day with normal breaks, and the individual requires ready access to a restroom, defined as within five minutes;
- Plaintiff is capable of performing past relevant work as a building repairer. This work does not require the performance of work-related activities precluded by Plaintiff's RFC; and
- Plaintiff has not been under a disability from October 19, 2012, through the date of the decision.

(AR 15-20.)

## III.

## LEGAL STANDARD

An individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). The Court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Id. (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)

("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.")

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff argues that this matter should be remanded for payment of benefits, or alternatively, for further administrative proceedings. Defendant concedes that this matter should be remanded, but argues that it should be remanded for further administrative proceedings. Defendant requests that the Court remand the case to enable the Commissioner to reevaluate Dr. Kelsen's medical opinion evidence and non-medical evidence in the record, such as Plaintiff's subjective complaints, and if necessary, Plaintiff's RFC.

Because Defendant agrees that remand is appropriate, the only issue remaining to be decided is whether remand should be for the determination of benefits or for further proceedings. Defendant argues that further proceedings are necessary because issues remain to be decided, while Plaintiff argues that his claim should be remanded for the determination of benefits in light of the VE's testimony and the fact that Defendant did not dispute that Plaintiff was clearly disabled if Dr. Kelsen's opinions are credited as true.[2]

The Court has the discretion to remand a case for either an award of benefits or for additional evidence. Smolen, 80 F.3d at 1292. The remand should be for "an award of benefits where (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." Id. District courts have flexibility in applying the credit as true rule. Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003).

Further, "[a] claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be." Strauss v. Comm'r of the Soc. Sec. Admin., 635 F.3d 1135, 1138 (9th Cir. 2011). The Ninth Circuit has clarified that "we may

---

[2] While Defendant did not explicitly dispute that Plaintiff was disabled if Dr. Kelsen's opinions are credited as true, Defendant did point to multiple outstanding conflicts in the record that preclude a judicial finding of disability.

9

remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.' " Burrell v. Colvin, 775 F.3d 1133, 1141 (9th Cir. 2014) (quoting Garrison v. Colvin, 759 F.3d 995, 1020 (9th Cir. 2014)).

The Court now analyzes the three-step framework to deduce whether this is a rare circumstance where the Court may decide not to remand for further proceedings. See Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1103 (9th Cir. 2014) (citing Garrison, 759 F.3d at 1020). As to the first step, Defendant concedes that the ALJ erred in the evaluation of Dr. Kelsen's opinion.

Second, the Court determines whether further administrative proceedings would serve no useful purpose by considering whether the record has conflicts, ambiguities, gaps, or unresolved factual issues. See Treichler, 775 F.3d at 1104 (citing Garrison, 759 F.3d at 1010; Varney v. Sec'y of Health & Human Servs., 859 F.2d 1396, 1401 (9th Cir. 1988); Moisa v. Barnhart, 367 F.3d 882, 887 (9th Cir. 2004)). In conducting the second step, the Court considers whether there are inconsistencies between the improperly rejected evidence and the medical evidence in the record. See Dominguez v. Colvin, 808 F.3d 403, 407 (9th Cir. 2015) (quoting Treichler, 775 F.3d at 1105). The Court also considers whether there is other evidence in the record that the ALJ overlooked that Defendant has pointed to and explained how Plaintiff's claims of disability are seriously called into doubt by that evidence. See Dominguez, 808 F.3d at 407 (quoting Burrell, 775 F.3d at 1141).

Here, further administrative proceedings would be useful. There are two opinions from Dr. Kelsen in the record: a November 28, 2012 medical source statement and a January 26, 2015 declaration. (AR 268-70, 436-39.)

On November 28, 2012, Dr. Kelsen stated that Plaintiff has ulcerative colitis with a limited prognosis and symptoms of chronic diarrhea, bloody diarrhea, abdominal pain and cramping, loss of appetite, malaise, and fatigue. (AR 268.) He indicated that the clinical findings and objective signs were ulcerative colitis at the colonoscopy. (AR 268.) He opined that Plaintiff needs a job which permits ready access to a restroom. (AR 269.) He found that

1  Plaintiff would sometimes need to take unscheduled restroom breaks for 20 minutes 3 to 5 times
2  a day and he would have "minutes to seconds" advance notice. (AR 269.) He also found that
3  Plaintiff would need to rest at unpredictable intervals for on average 30 minutes before returning
4  to work. (AR 269.) The only psychological condition or symptom affecting Plaintiff's physical
5  condition was decreased energy. (AR 269.) Plaintiff's physical pain or other symptoms are
6  occasionally severe enough to interfere with attention and concentration, which is defined as 6 to
7  33% of the working day. (AR 269.) Dr. Kelsen opined that Plaintiff is capable of low stress jobs
8  because stress aggravates the diarrhea. (AR 269.) Plaintiff's impairments are likely to produce
9  good days and bad days and Plaintiff is likely to be absent from work more than 4 days a month
10 as a result of the impairment or treatment. (AR 270.)

11        Dr. Kelsen submitted a declaration, dated January 26, 2015, which states that Plaintiff
12 continues to have diverticulosis and he suffers from ulcerative colitis. (AR 437.) Dr. Kelsen
13 stated that Plaintiff's ulcerative colitis symptoms are reasonable given the underlying clinical
14 signs and findings, because Plaintiff continues to have abdominal pain, diarrhea, and bleeding.
15 (AR 437.) Dr. Kelsen indicated that Plaintiff needs a job that requires ready access to a restroom
16 because people with ulcerative colitis have chronic diarrhea and bleeding. (AR 438.) Dr. Kelsen
17 stated that he opined that Plaintiff would need unscheduled restroom breaks 3 to 5 times a day
18 for 20 minutes at a time, because his chronic diarrhea would cause him to need frequent restroom
19 breaks. (AR 438.) Dr. Kelsen indicated that he based his opinion in the Medical Source
20 Statement on the colonoscopy which showed colitis, positive physical findings, biopsies,
21 physical examinations, and history. (AR 438.) Dr. Kelsen found that Plaintiff would only be
22 capable of low stress jobs because stress aggravates colitis and precipitates flares, which entails
23 his symptoms worsening. (AR 438.) Dr. Kelsen opined that Plaintiff would miss 4 days of work
24 a month because of good days and bad days because ulcerative colitis is very unpredictable and it
25 can flare and improve unpredictably. (AR 438.) Dr. Kelsen declared that a good day for
26 someone with colitis would be no diarrhea and abdominal pain and normal bowel movements.
27 (AR 438.) A bad day would be ferocious diarrhea, pain, and bleeding. (AR 438.)
28        While there is objective evidence in the record to support Dr. Kelsen's opinion, the Court

finds that there are conflicts and ambiguities in the record that could be resolved in further administrative proceedings. As noted by the ALJ, the severity of symptoms and functioning is inconsistent with Dr. Kelsen's notes indicating that Plaintiff's condition is stable. (AR 18.) Dr. Kelsen's treatment notes indicate that Plaintiff was stable on September 6, 2013, and August 26, 2014. (AR 396-97.) Dr. Kelsen noted that Plaintiff was doing well on June 23, 2014. (AR 397.) These three treatment notes raise significant questions regarding the extent of Plaintiff's impairments. It is unclear what Dr. Kelsen meant by stable. While Defendant appears to assert that stable means that Plaintiff's condition has improved, Plaintiff argues that stable means that the condition has not changed. The fact that there are notations in Dr. Kelsen's treatment notes that Plaintiff was stable at times and doing well at other times creates a question that further development of the record can resolve. There are several other notations in the record that suggest that Plaintiff's condition may be improved and inconsistent with Dr. Kelsen's opinions and Plaintiff's subjective complaints.

An August 12, 2014 office note from a visit for a swollen eyelid states that Plaintiff has a history of ulcerative colitis, but it is resolved. (AR 391-92.) Dr. William Brown III's March 5, 2014 operative report for Plaintiff's hernia operation states that "[Dr. Brown] [has] worked with [Plaintiff's] GI doctor and eventually got him off the steroids. He still has some symptomatic GI symptoms, but these are well controlled with other agents." (AR 383.)

The Court finds that the record raises crucial questions as to the extent of Plaintiff's impairment given inconsistencies between Dr. Kelsen's opinion and multiple notations in the record. The Court also finds that this same evidence in the record casts serious doubt on Plaintiff's subjective complaints, so Plaintiff's testimony cannot be credited as true at this time. Accordingly, the Court finds that remand for further proceedings is the appropriate remedy here.

Finally, Plaintiff seeks an order instructing the ALJ to accept or reject specific findings from the ALJ's decision. However, the Court declines to do so. While there are still outstanding issues as to the evaluation of the medical evidence and non-medical evidence, and if necessary, Plaintiff's RFC, upon remand it is for the ALJ to determine what steps are necessary to fully develop the record.

## V.

## ORDER

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's appeal from the decision of the Commissioner of Social Security and Plaintiff's motion for summary judgment are GRANTED IN PART;
2. Defendant's motion to remand is GRANTED;
3. This action is remanded to the Commissioner for further administrative proceedings consistent with this order; and
4. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: __**March 21, 2017**__

UNITED STATES MAGISTRATE JUDGE